My name is Leticia Moreno. I represent Mr. Reyes and Ms. Cortez, who are here with their family and supporting individuals. Your Honor, in this particular case, we're asserting that Mr. Reyes and Ms. Cortez's due process rights, process of law, were violated. They were violated twice. They were violated when they were not able to communicate with the court in the best, in their best language, when they were not provided a translator to be able to communicate in the best language, and two, when they were represented by incompetent, ineffective assistance of counsel. With regards to the translation, we assert that the Board didn't analyze the record, what happened at trial correctly, to reach the conclusions of the due process violations of the translations. Ms. Moreno, maybe you can tell us today what testimony that Mr. Reyes Luna would have been able to give if the translation had been different, or maybe phrased it differently. What testimony was he unable to give because of what you allege to be the inadequate translation? As we look at the record, specifically the last case where the merits took place, De Novo, there was a question asked by their attorney at that time, Ms. Kapur, that asked, are you afraid to return back to your country? And that's when we see all these misunderstandings, lack of communication. They're just very confused with the answers, but basically they're talking about a house being burned down, people coming and taking over the land, and that wasn't able to be flushed out because of the communication problem. He was speaking in Spanish, whereas evident by the record that he had already said previously that his best language was Mixteca. At the point that he did start explaining what was happening back in their country or their region where they were from, that's when the judge says, stop. I don't want to hear what's going on with the parents, which is the parents are the family members of my clients. And you say in the record. In the record there's various places that it states that their best language was Spanish. I mean, I think there is one point where the immigration judge says, well, maybe the Mixteca might work better, but repeatedly it seems in other parts of the record your clients indicate that Spanish would be the better way to proceed. What are we to do with that? Well, we take a look at the record and analyze it the way the Ninth Circuit Court has asked us to do. There's 16 instances where they are not understanding what is going on. There's nine instances where they're nonresponsive. And there's four instances where the actual translator says they're not understanding, they need to clarify. So those are the things that we should be looking at, and that's evident in the record. At some point, in fact, with the first hearing, the one at the third hearing, which was the first merits hearing, the translator says, oh, I've been having problems communicating with the Respondent. I thought they just didn't know how to express themselves. But it seems to be a moment of epiphany when everybody realizes, well, what do you mean you don't understand that word? And the judge asked, Judge Tabador asked, what do you mean you don't understand that word? And that's when they realized that his original language, his best language, as he explains it at that moment, is Mixteca. Kennedy. This sort of ties in. You also make an ineffective assistance of counsel claim against Attorney Kapoor. But there was no compliance with Lozada. Can you explain why not? Well, Lozada does not rule in the Ninth Circuit. The Ninth Circuit, as you're aware, requires a different way of analyzing when there's an incompetent. I'm sorry. I don't understand that. Lozada requirements are enforced in the Ninth Circuit. So I'd like to know why there wasn't a following of Lozada. Lozada or procedural, the procedural, the procedural things to follow, it doesn't go to the substance of what's happening with regards to the competence of the attorney. And the Ninth Circuit, it says that they're not going to rigidly follow what Lozada is requiring. Lozada simply says, submit the complaint to the attorney. Let him answer. Submit it to the board. You're obviously citing a case that you think says that. Would you tell me what case says that? That case, let me see if I can, I should have that in memory, but it eludes me at this point. I'm sorry, Your Honor. At this point, I don't, I just went away from my memory. I know there's a case. It's cited in my brief. Ms. Moreno, you're talking about Lozada being merely procedural, but the point of the procedure is to give the court some ability to understand what the ineffective assistance was. Unless it's clear on its face in the record, Lozada requirements have a distinct and important role. How do we tell from the record that this is a clear and obvious ineffective assistance? It just doesn't seem to be demonstrated in anything we have before us. I believe it does in terms of the testimony that's in the transcript. There's a couple of things, because in essence, what I see is that my clients were not afforded the opportunity to submit an asylum claim. And that comes up a couple of times during the transcripts. When the third hearing, where Attorney Holdman, who wasn't an attorney actually at that point, doesn't realize that his clients speak Mixteca. Now, the asylum claim, which is based on where the region where my clients are from, the region of Chalcatango, they have different types of dialects there, and there's so much happening within that region in terms of ethnic tension, there's violence, lands being taken over. But at that point, that attorney heard, oh, wait, my client speaks another language, it's obvious that that attorney, Holdman, never asked the client, are you afraid to return to your country? Where do you live? What language do you speak? Well, let's just go to the de novo hearing, the last hearing, where Attorney Kapur is asking many questions, meandering through the whole situation. At some point she asks, are you afraid to return back to your country? And they say yes. Now, isn't that a question that should have been asked before, before they went to court? Because it's obvious that she's digging for information at that point, there's an epiphany at that point, oh, something's happening here. If you look at the beginning of the record when they start saying, well, what language do you really speak, in the confusion, three hearings before the last hearing. Attorney Kapur says, well, I have no problems communicating with my client, because my staff communicated with them, my staff. She refers to my office staff. She doesn't refer to her talking to the client. There's no evidence that she actually sat down and spoke to the clients and actually asked them all the questions or prepared for the hearing. If Attorney Kapur was prepared, she would have, she would not have adhered to the, to Judge DeBoer's request to don't talk about the parents anymore. Because it was more, there were more elements to discuss, not solely on asylum, but even to the, to the extreme, extraordinary hardship that the family would face in the return to such a region, where there was obviously problems where houses were being burned and people being forced out of their homeland. But one of the ultimate issues, I think, on the asylum claim, especially for Ms. Cortez, is the fact she's been in the United States since 94, and there's nothing in the record to indicate that it would be timely at the stage of these proceedings that are now under review to have asserted an asylum claim, or no exception, tolling, or other way for it to have been rightful adjudication. So the question of prejudice really is a tough one, I think, on that point. There was never an opportunity to even present a case with regards to timeliness. It never even got to that point. The Board has not allowed this issue to get to that point, especially in the way that the Board analyzes the different aspects of the due process issues. Do you want to reserve? Yes, Your Honor. I'll reserve for rebuttal. Thank you. Thank you. Good morning, Your Honors. Arthur Rabe on behalf of the Attorney General. First of all, I'd like to take up the issues in the same order that Petitioner's counsel did, that is, starting with the translation issue. We would submit there is no due process violation, or there's no due process issue, because the ultimate form of relief that Petitioners were seeking was discretionary. It was cancellation and removal. And Petitioners have no liberty or property interest in such forms of relief. They're discretionary. That's due process under Supreme Court case law. Specifically, I'm referring to Board of Regents v. Roth, 408 U.S. 564, cited in our brief, which specifically states, the requirements of procedural due process apply only to the deprivation of interest encompassed by due process clauses of protection of liberty and property. Now, this Court has held in Tovar Landon v. Ashcroft, as well as in Munoz v. Ashcroft, both cited in our brief, that there is no liberty interest in discretionary forms of relief, because there are privileges being granted by Congress. However, even assuming that this Court finds there is some sort of liberty or property interest in discretionary relief that is being sought in this case, there was no due process violation, for the very reasons that Your Honors can see in the record. They specifically and repeatedly asked for Spanish interpreters on, this is during five different hearings, on eight different occasions that we cite in our record. Because the male Petitioner, Mr. Reyes-Luna, said that is his strongest language. He testified to English. As opposed to, no, Your Honor, as opposed to the Azteca that was, the Mixteca, I'm sorry, that was being offered him by the administration. Well, originally, I thought the point was that he was asked whether English or Spanish was his better language. On that one occasion, he said, oh, Your Honor, I thought you were referring to English or Spanish. Yes. But thereafter, there are numerous instances in the record where he again, I mean, there were numerous hearings that followed where the immigration judge wanted to ensure that he understood what she was saying. And she would still ask him, what is your strongest language? And he still repeatedly said, Spanish. He said, I don't understand some words, but that is my strongest. And the record reflects that. Because even though he did not grow up speaking Spanish, he had been in the United States since 1990, where he testified that he spoke daily Spanish since he came to the United States. So at least for the last 17 years, he had been speaking Spanish. So this was indeed, according to the record, his strongest language. Moving on. Why did the IJ cut off Ms. Cortez's testimony when she began talking about what could potentially be a valid asylum claim? Well, it wasn't a valid asylum claim because, first of all, they withdrew the asylum claim. So that was only as to Mr. Mr. Reyes Luna. She was his derivative. But, yes, it was his assignment, which they withdrew it. Thereafter ---- She still had a potential claim. Possibly. We don't know that. So that was the question that was posed. Yes, Your Honor. And so to answer that, she said that she indeed testified about instances where her brother and her father had been harassed and possibly persecuted because of a land dispute with someone, some other town. And she said that their house was burned down. That all came out in the record. That was not stopped. Thereafter, she was asked, what else do you fear? And she said, well, I fear that my children will not get the education that they require. What else? She said, well, jobs. So only if ---- No. Well, then she was asked, do you have any fear of returning to the community you belong to? Do you think you're going to get harm? The government objected to the question as leading, and the IJ sustained the objection. What do we do with that? Well, Your Honor, it was leading. It could have been rephrased. Are you referring to page 198, Your Honor? It looks like it's 195 and AR80. AR80 is what I have here. Okay. 00198. And then it looks like Kapor asked instead, what do you think would happen to you if you go back to the town you belong to? And she said she couldn't because it had been burned down. And I think she testified a little bit more. She could visit her family, but she couldn't establish herself there with children because there's no classes, there's no teachers, there's nothing. Well, Your Honor, you have to understand this in context. Going back to the previous page, which is page 79 of the transcript, she, for that whole entire page, testified about what happened to her parents. Thereafter, when she was asked the leading question, the objection was sustained on the next page. But then she continued to talk about what would happen to her. And all she could say, she didn't say, I fear being assaulted, being persecuted or threatened or anything like that. All she could talk about was that she has no place to stay. She could have said, I cannot go back because I fear that the same thing that happened to my parents will happen to me. She did not. For the next page, all she could talk about was, I can't go back because it was burnt where my parents are now. She was asked, do you think you can relocate, go to a different place in Mexico? She said, no, because we don't have, I presume she said anywhere to go. Why can't you go where your father is? Well, she said, I can go visit them, but not to establish myself there because there is no, well, there is no classes, I'm quoting here. There is no teachers and there is nothing. So it's not like she's saying she fears returning because anything that could possibly be construed as persecution, but only because of convenience. She says she has no place to stay. It would be a hardship for her to return as well as for her children. Thus, at that point, the immigration judge correctly noted on the next page that since she had not raised an asylum claim previously, in fact, they had waived it, the judge said, well, can we focus on what happened to her and not to her parents? And at that point, she could have said, this was on page 81, well, here's what I feared could happen to me, not to my parents, to me. Well, that leads into the question I posed to counsel about the ineffective assistance of counsel claim. Why wasn't this, why wouldn't there be a viable IAC claim here if the attorney hadn't been better prepared? She could have pursued this line of inquiry. It wouldn't have come up so indirectly. Well, Your Honor, that is exactly why we have the procedural safeguards of a matter of Lozado. We don't know what happened because the attorney who was representing was never given the opportunity to respond to these allocations. And based on just the face of the record, it's not clear what happened. Now, Petitioners say why shouldn't we relax Lozado in this instance? I mean, I think the case, there's a case out there that says they don't have to be critically adhered to. You know, it just depends, I guess, on the nature of the clear violation. Yes, Your Honor. And that's the Reyes case that's cited in our brief. In Reyes, they said, yes, if it's clear and obvious from the record, then yes, you can relax the Lozado requirements. But here it is not. We would submit it is not clear and obvious from the record. And because the attorney has not been given an opportunity to defend herself against these allegations, Lozado should be followed. Lastly, we would just say that there is no prejudice here based on either the IAC or the interpretation issue. As to interpretation, none of the incidents that are cited in their brief about the so-called miscommunication or unresponsive answers have been shown to have affected the outcome of these proceedings. That is, the judge decided that they had not shown the exceptional, extremely unusual hardship standard that is required for cancellation and removal. Now, the record incidents that they showed, they have not been able to establish how that affected that ruling. Same thing with the IAC claim. There has been no prejudice shown because they say that because they withdrew the application on the advice of their counsel, they were somehow deprived of due process due to the IAC claim. But as Judge Battaglia noted, you know, they are supposed to have a one-year statutory requirement they were supposed to meet to show that they can, you know, meet asylum. They didn't do that, and they never said why they didn't, that there's some kind of exceptional circumstances why they couldn't comply with the one-year requirement as to asylum. And as to Mr. Ray's Luna's asylum application, there is no prejudice in that one because in the application, if you actually read it on page 518, he states he was never persecuted in the past, and he does not fear persecution. Thus, there was no valid asylum application as to him or her. Subject to the Court's questions. Thank you. Thank you. Ms. Moreno, I'll give you a minute to respond. You had 25 seconds, but we'll go ahead and give you a minute. I have one more minute. Okay. Quickly. The ultimate right to due process, it does exist under asylum claim, perhaps in certain situations not under cancellation. But the whole issue here is that the Board, when they analyzed the competency of the attorney, when they analyzed whether the translator was the correct translator, did not apply the proper manner in which to evaluate it as required in the Ninth Circuit. That within itself is a due process issue. That within itself is prejudice. Now, counsel refers to that the judge repeatedly asked the clients, the respondents, do you speak Spanish? The first question that was asked of the client at the first hearing is, by the judges, is Spanish still your best language? She didn't ask what is your best language. Is Spanish still your best language? And all through the proceedings, that's all she would ask every time. And even when there was supposed to be a mistaken interpreter there that never seemed to appear, she asked at the beginning every single time, is Spanish your best language? Doesn't that create a chilling effect? Doesn't that create expectations that respondents feel, well, maybe this is what I should say? Thank you. Thank you very much. Thank you both for your arguments here today. I'm very grateful to you for presenting your best case here. We're ready to go. The matter is now submitted. We're ready to proceed to the next case. So the next case is Juan Francisco Bernabe versus Eric Holder. Do you need a minute to set up, or are you ready to proceed? I'm ready. Thank you, Your Honor. Your Honor, before I introduce myself, may I reserve two minutes for rebuttal? Certainly. Just keep track.  I'll do that. Good morning, Your Honor, counsel, and may it please the Court. Robert Burke, B-E-R-K-E, on behalf of the Petitioner, Juan Bernabe, Juan Francisco Bernabe. Your Honor, I can boil down the argument that I've made in my brief to about four words, and those four words are 2010 came after 2009. We did a motion to reopen alleging changed country conditions. We submitted evidence and articles showing what we perceived to be persecution of indigenous Guatemalans. That occurred mostly in and around 2010, at least were reported in 2010. The Board, in its decision, said we've looked at State Department reports from 2009, and we don't see anything significantly different that happened between 2005 and 2009, to which I can respond, that's right. Our complaint has to do with things that occurred and were reported after the 2009 State Department report, specifically in 2003. I'm sorry, Your Honor? There were some statements in the 2009 report dealing with the exploitation of the indigenous people, the collateral effects. Your argument is what? That 2010 was much more specific and pervasive? Exactly, which is why multi-figures so prominently in the argument. My argument at that time and before this Court is that what the Board had to do is the Board had to look at what was reported in 2010 and say, are these things that are now being reported in 2010 materially different than what was reported or what was included in the State Department report in 2009? They don't do that. Now, they might have said we've looked at the materials from 2010, and the materials from 2010 parrot back or simply reiterate stuff that we knew in 2009. They don't do that. They give very short shrift to anything that transpired in 2010. In fact, really all they say about the materials from 2010 is the State Department report is superior. Now, I don't want to use much argument time, unless the Court invites me to do so, about the fact that this had to be done in phases because they took my client, moved him to Mexico, I couldn't get the statement right away, et cetera, et cetera, et cetera. But that the Board went ahead and said we're accepting these materials, even though they weren't presented to the Court. And they say we're accepting the U.N. report, we're accepting the Wikipedia article. Also in that evidence happened to be the Amnesty International article talking about recent events of 2010. But all they really say about the 2010 evidence is we've considered it and we find the 2009 State Department report to be superior to that or of higher significance and higher convincing value than anything that happened in 2010 without ever saying this is why, or without ever saying this is why something may be materially different, or this is why what's been presented from 2010 is not materially different. So I don't know, honestly, what the Board did with my 2010 materials, although they acknowledge them, and I've argued it in my brief, and it may be an extension of existing law to make the argument here in the Court. But simply acknowledging them is not a substitute for considering them. Is there any evidence in the record that suggests that Mr. Barnaby himself will be the subject of persecution if he returns to Guatemala? No, Your Honor. That's not something that was presented to the Court, the Board, and that's not something that's been before this Court other than the fact that, and this does kind of come up interestingly in at least one of the responses, not the responses made to this Court, but I think the opposition that was made in the Immigration Court originally, is, remember, Mr. Francisco, Mr. Barnaby, is not claiming to be a part of a social group, per se. This is an ethnicity issue. This is affecting people of his specific ethnicity, and it's happening in very, very broad strokes throughout Guatemala right now. So he can't leave his ethnicity at the door. When he goes back to Guatemala, there's no reason to believe he's not going to be treated as the same as other people of his ethnicity, of his language. He's a Canoval speaker, speaks the Court would have to take my representation, even speaks Spanish very poorly, but Canoval is a difficult language. Kagan. So you say based on ethnicity, you know, there's references to these communities, to these communities and what's happening to these communities. Right. But I guess I'm just trying to connect, and is there anything in the record that Mr. Barnaby or Bert Barnaby is from one of the communities that was forcibly evicted? No, other than the fact that he's a member of a Mayan community in the indigenous peoples of Guatemala or the peoples of Mayan heritage, and he speaks a Mayan language. Mr. Brook, to the contrary, he was not part of the communities directly affected, as the record reflects. And the catalyst to a lot of the unfortunate circumstances down there seemed to revolve around the Marlin mine, which had ceased operation. And so with that removed from the picture, with the fact that he has no nexus to the follow, the Ninth Circuit precedent, to say that he was going to be directly affected by any of the changes in the circumstances. He is Mayan, granted, but it's not his community specifically. The catalyst to a lot of the discrimination seems to have removed, and it was noted that politically things were changing for the better. Circumstances were better with the Marlin mines closed. All of that works against, I think, your client's position for asylum. Your Honor, insofar as that Mr. Francisco hasn't lived in Guatemala since the 1980s, I must concede, and I'm happy to do so, that it's very difficult to connect him because he hasn't been a member of a community there for a long time. Of course, once he returns, he's immediately associated with that same community simply because of the language and the accent. That having been said, however, that having been said, however, it's difficult for me to speculate that that's what the board's rationale was because they don't say it. They don't tell me that. They say we've considered things from 2005 and 2009, and we're just going to say that's a little bit more persuasive than what you've given us from 2010. Had the issue been one of, hey, this is not a material change, right, then what the board should have done is said this is why this isn't enough of a change, but they didn't address 2010 authorities. They only addressed as far as 2009. So the argument that I made to the board was we have an individual who's a member of a particular community. This particular community is being persecuted. When he goes back, he's a member of that community. As such, he's personally subject to the exact same persecution. If the board wanted to say we don't believe that the stuff that happened in 2010 was materially different and here's why, I wouldn't be able to make that argument. But what the board did is they said, well, because things weren't that bad in 2009, they must not be that bad in 2010. And unfortunately, that's all I can really glean from the board's decision. Kagan. Do you want to reserve the rest of your time?  Thank you very much for reminding me, Your Honor. Thank you. Good morning again, Your Honor. May it please the Court. Arthur Raven on behalf of the Attorney General. The agency acted well within its discretion in this case to deny the untimely motion to reopen. The agency did so on two bases. As part of your response, deal with the specific point that was made at the end. The board does not appear to rely on the lack of nexus claim. They seem to be simply reacting to the information because they state, after quoting the 2009 State Department report, they say the treatment of the Mayan people has not changed significantly since 2005. And in terms of political participation, may have improved. While we sympathize with conditions of the Mayan people, social discrimination and economic disadvantage do not constitute persecution. I don't see any discussion in there of saying even if they did, he hasn't established any connection to himself. Would you agree with that? Well, I disagree with that, Judge Fischer. And for this reason. Could you explain why? Well, the scope of standard review is set out in our brief, specifically points to the fact that this court may look beyond the board's decision to the immigration judge's decision if it helps explain the board's decision. And here the board specifically said on page 2 of its decision, in the very last paragraph, after the discussion of what has possibly changed, it also said, well, we agree with the immigration judge the current conditions of Guatemala have not changed sufficiently since Respondent's in absentia proceedings, such that Respondent now has a well-founded fear of future persecution. So it agreed with the immigration judge's decision, which if you look at, specifically says he has not established a nexus to his personal situation. He has not shown how displacement of possible ethnic Mayans from their land personally affects him. That was the whole gist of the immigration judge's reasoning when he denied this claim. So the board actually shows that we, you know, they look at the change of country conditions, and then it's at the end, and then we agree with the immigration judge that he has not shown a well-founded fear, because in the immigration judge's decision, that reasoning is that based on this Court's decision in, I think it's, I can't pronounce it right, not Jamadi. I don't know. I will give you the site. It's not Jamadi. 597 F3rd 93. And in that decision, this Court specifically held that based on Malti and Basin, the two decisions that are cited therein, that the motion to reopen was properly denied in that case because the motion simply recounted generalized conditions in Iran that fails to demonstrate, quote, that her predicament is appreciably different from the dangers faced by her fellow citizens. So the immigration judge directly quoted this language and said, how is your situation appreciably different than those of others in your country? And Petitioner was not able to show. And because the board agreed with the immigration judge's decision that he hadn't shown a well-founded fear, we would submit that that is an additional layer of reasoning. I'd like to explore that, because I noted that they did cite the IJ, but they cite page 3 of the IJ's decision. And they cite him for this statement, we agree with the immigration judge that the current conditions in Guatemala have not changed sufficiently since respondents in absentia proceeding in 2005. The IJ, on page 3, says, thus as in Najam Bari, respondent relies only on general conditions existing in Guatemala. He does not link those conditions to his particular circumstances. Additionally, respondent does not distinguish the present conditions outlined in the above-mentioned documents from those existing in Guatemala at the time of his various hearings from March 8, 2000 to July 26, 2005. That sentence I would agree they are citing to. I would disagree, counsel, that we should infer that they were talking about the prior sentence. If they wanted to do that, then it seems to me they would have said it. Your Honor, I would humbly differ with you, because I think that if they were going to parse the immigration judge's reasoning and rely only a portion of it, then they would have only cited a portion of that reasoning. Well, I think that's what they did. That's how I read what they did. Because I'm just reading the matching the statement that they're making in their opinion and the statement that they're citing to in the IJ, which matches that. Well, Your Honor, I — We have differing — Yes, Your Honor. I mean, that's just a different reading, Your Honor. But — Do you think there's a place where, in the BIA's decision, where it does address Mr. Burnaby's argument about forcible eviction and the mining? Because it looks like the BIA's, and I guess this is just a little bit more of what you've been talking about, decision does discuss this indigenous community's participation in politics, but it looks like Burnaby's motion to reopen was based on the forcible evictions and the effects of mining on indigenous communities. I don't know that they directly deal with that. Do you think that they do? I don't see it, Your Honor. You know, they don't specifically discuss any of that in their decision. Right. So, I mean, they say they consider it, but they don't address it, mostly because of what they're focusing on the State Department country reports. And so is that not significant, that they're not addressing it? Well, it is significant to the fact that they don't see it as substantial evidence of changed country conditions. That is, what petitioners submitted, such as Wikipedia articles — But that's specifically what's causing his potential, you know, I mean, his fear of returning, and it seems like that's unaddressed. I mean, it's kind of like they're talking all around it, but not to that. And so I just would like to hear your best, you know, defense of that. I mean, Your Honor, I can't second-guess the Board, but this Court has held that the Board does not have to write, quote, an exegesis on everything that happened, on every — and it does not have to address every argument. So — It has to address the argument that's the basis of the motion to reconsider. Well — You can't just go back and treat it as, you know, you want to argue this is changed country condition. There's new evidence of new kinds of activity, and then have the Board just say, well, there is no change because there's no difference from 2005 without addressing the new circumstance that's specifically called out. I mean, they acknowledged the new evidence? They specifically admitted it? Yes, they do, but they don't address it. But what they said, the best evidence, showed there was no change. But the — This Court has held that the State Department country reports are the best and most appropriate evidence of political changes in the country. That may be, counsel, but he was making an argument based on new evidence that postdated the State Department report. Well, Your Honor — We don't uphold the State Department report if it's not — if it's been superseded in some fashion. Now, the Board may have been able to say, this information about the exploitation of indigenous peoples connected with the mines and everything else, and — but that's different from what they had argued the first time around, and that's different — you This decision seems to be saying — seems to be missing the point, and that's what's troublesome. I think, Your Honor, what the Board did here was that it looked at these articles because it specifically said it did, and noted that none of them were comprehensive. They were little vignettes about persecution of this person and the murder of that person. Counsel, our rules are we don't go back and — we have to give deference to the BIA, but they have — we can't go beyond what they say in their opinion. Right. Now, if they incorporate some specific part of the IJ or say that that's what they're relying on, which was your first argument, okay, if they did it. But all the citation is to the kind of arguments that were made initially, and what the State Department — even what they quote from the State Department report doesn't address the new points that he's making about the exploitation of indigenous peoples and the evictions. I guess I'm hanging my hat on, Your Honor, is their just use of the fact that they found the State Department reports highly probative. I'll concede that they're highly probative, but they have to be probative as to the point that's being argued to them, and they haven't clearly said why they're highly probative to the new argument. They did not do so, Your Honor, other than what we can read into their decision, which is probably why they referenced the immigration judge's decision at the end. Okay. Thank you. Yes, Your Honor. Please proceed. Thank you very much, Your Honor. Your Honor, in light of the questioning and concessions of counsel for oil, I'm actually — unless there's a specific inquiry from the panel, I'm prepared to waive my rebuttal time and submit.  All right. You never have to use all your time. It's the first time I haven't, Your Honor, and it feels weird doing it. But thank you very much. Thank you. Thank you both. And thank you for having me for a role argument. Okay. Thank you both for the excellent discussion here today. We really appreciate it.
judges: Battaglia, FISHER, MURGUIA